**CAE SCREENPLATES INC.,**
**Plaintiff–Appellant,**

**v.**

**HEINRICH FIEDLER GMBH & CO. KG and Fiedler Corporation (now known as Fiedler LP), Defendants–Appellees.**

**No. 99–1278.**

United States Court of Appeals,
Federal Circuit.

DECIDED: Aug. 24, 2000

**1310**

Robert A. Vanderhye, Nixon and Vanderhye P.C., of Arlington, Virginia, argued for plaintiff-appellant.

Joyce B. Klemmer, Smith, Gambrell & Russell, LLP, of Atlanta, Georgia, argued for defendants-appellees. With him on the brief were Elizabeth G. Lowry; and Richard G. Young, of Washington, DC.

Before BRYSON, GAJARSA, and LINN, Circuit Judges.

## DECISION

GAJARSA, Circuit Judge.

Plaintiff–Appellant CAE Screenplates, Inc. ("CAE") appeals the decision of the United States District Court for the Northern District of Georgia granting Defendants–Appellees Heinrich Fiedler GmbH & Co. KG and Fiedler Corporation (now known as Fiedler LP) (collectively, "Fiedler") summary judgment of non-in-

fringement. *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. K.G.*, No. 1:96–CV–56–JTC, slip op. at 1 (N.D.Ga. Dec. 17, 1998). Because we conclude that the district court properly construed the language of the claims in dispute, and properly held that no reasonable jury could find that Fiedler infringed these claims either literally or by equivalents, we affirm.

## I.

## BACKGROUND

This case concerns devices used to screen contaminants from pulp slurry during the production of cellulose-based products. Cellulose-based products include paper, paper board and cardboard. Each of these products is made from cellulose pulp, which consists of a liquid slurry of wood fibers. During production, pulp is fed into a paper machine and laid down in a nonwoven web. After the liquid is removed from the slurry, the web is dried. The result is the final board or paper product.

To assure a high-quality finished product, contaminants must be removed from the pulp. These contaminants include debris, knots, shives and dirt. To remove the contaminants, the pulp is screened mechanically, so that the desired fibers are isolated. Typically, screening relies upon differences in size and shape between the desired fibers and the unwanted contaminants.

Contaminant screening typically takes place within a pressure screen machine. The machine passes the pulp over a foil on a rotating rotor, creating turbulence in the pulp itself. At the same time, the pulp is pressed against a screen plate or cylinder which includes perforations. The perforations may consist of either drilled round holes, or constructed rectangular grooves having a certain width and length. Caught between the rotor and the cylinder, the pulp separates. With a grooved plate, contaminants with a width and length greater than those of the grooves continue along the flow direction. In con-

trast, pulp fibers with dimensions smaller than the grooves fall through and are collected.

Screening performance is measured according to a number of criteria. The screening machine must allow a large volume of pulp to pass through over a given period of time. The machine must also remove a high percentage of contaminants, and also remove only a small portion of good fibers. These factors are evaluated by volumetric capacity, debris removal efficiency, and the reject rate.

In 1983, Harry Lampenius filed an application for a particular kind of cylindrical screen plate. On July 16, 1985, Lampenius was awarded United States Patent No. 4,529,520 (the "'520 patent"). The '520 patent is entitled "Screen Plate" and describes a screen plate with grooves at the bottom of the plate, with perforations. The grooves are oriented so that they are substantially deviated from the pulp flow direction. Figures 1 and 2a of the '520 patent illustrate one configuration of the claimed invention:

FIG. I

FIG. 2a

As explained by reference to the numerals depicted above in Figure 1, the screen plate is formed along the inner surface of a screen drum 1. The plate includes grooves 2 which run parallel to the drum axis. Unscreened pulp enters the drum and rotates along the surface of the screen in the direction of arrow B. At the same time, the pulp moves in the direction of the rotational axis towards the reject end of the drum.

Because the force component in the direction of the drum circumference is significantly larger than the force component in the direction of the rotational axis, the pulp flows essentially at a right angle to the direction of the grooves. As depicted in Figure 2a, the grooves in turn are formed of a bottom plane 3, which is substantially parallel to the envelope surface,

an upstream side plane 4 and a downstream side plane 5.

The '520 patent discloses a variety of embodiments, each with different groove orientations and shapes. For example, in the screen plate depicted in Figure 2a above, the angle between the surface of the plate and the upstream side plane 4 is approximately 90 degrees. In contrast, the angle between the plate surface and the downstream side plane 5 is between 5 and 60 degrees. Other embodiments include additional surfaces parallel to the plate surface for improved wear characteristics, and U-shaped grooves with both side planes 4 and 5 substantially perpendicular to the envelope surface.

Only claim 1 of the patent is at issue in this case, and it provides as follows:

1. A cylindrical screen plate for screening smoothly unscreened pulp and for separating the accept portion of the pulp from the reject portion of the pulp, the screen plate having an inlet on one side for introducing the unscreened pulp, an outlet at the opposite side for removing the reject portion and having an envelope surface, the screen plate being provided with means for moving the unscreened pulp along one first flow direction, the screen plate having grooves in the side of the inlet recessed in the screen surface, said first flow direction being essentially transverse to the grooves, the grooves being formed of an upstream side plane, a downstream side plane and a bottom plane, said bottom plane being substantially parallel to the envelope surface of the screen plate, the grooves having perforations in the bottom plane, the upstream side plane of the grooves being substantially perpendicular to said envelope surface and the downstream side plane of the grooves forming a 60–5 angle against said envelope surface.

As originally presented, claim 1 provided for "[a] screen plate, wherein the perforations of the screen plate are disposed at the bottom of grooves the direction of which substantially deviates from the flow direction of the pulp to be screened." After claim 1 and its dependent claims were rejected for indefiniteness under 35 U.S.C. § 112 ¶ 2 (1994) and for anticipation under 35 U.S.C. § 102 by United States Patent No. 4,276,159, the applicant amended claim 1 to include the term "bottom plane." The applicant also argued against the anticipation rejection.

Once again, the claims were rejected for indefiniteness and anticipation. This time, the applicant rewrote the claims, and included an expert declaration. The claims were subsequently allowed.

Fiedler manufactures two types of screen cylinders, the "Bar Screen" and the "Top Screen." In 1990 and again in 1993, CAE, as assignee to the '520 patent, accused Fiedler of trademark infringement and notified Fiedler that it held patents related to screen plate technology. In response to these accusations, Fiedler contended that its screen cylinders practiced the invention disclosed in Fielder's United States Patent No. 5,073,254.

In September 1995, CAE filed suit for patent infringement in the United States District Court for the Eastern District of Virginia, alleging that Fiedler practices the invention disclosed in claim 1 of the '520 patent. CAE also alleged that the infringement was willful and deliberate, entitling CAE to enhanced damages. The case was subsequently transferred to the United States District Court for the Northern District of Georgia. At the close of discovery, Fiedler moved for partial summary judgment on several grounds. First, it argued that the '520 patent was invalid for anticipation in light of two prior patents, Canadian Patent No. 972,322 (the "Canadian '322 patent") and Swedish Patent No. 427,124 (the "Frykhult patent"). Second, Fiedler argued that the Bar Screen cylinders do not literally infringe the '520 patent and that CAE is precluded from asserting the doctrine of equivalents based on prosecution history estoppel. Fiedler also moved for partial summary

judgment on the issue of lost profits and other claims for damages.

The district court on December 17, 1998 granted Fiedler partial summary judgment on the issue of non-infringement, denied its motion for partial summary judgment on the issue of patent invalidity, and denied the remaining portion of Fiedler's motion as moot. First, the district court construed the meaning of the term "bottom plane" in claim 1 of the patent. According to Fiedler, the term constituted a structural limitation on the claimed invention. CAE disagreed, arguing that the term was merely "definitional" and served to locate the perforations in the screen at the bottom of the grooves.

The district court agreed with Fiedler. The district court initially noted that the bottom plane was but one of three components of the groove, along with the upstream side plane and the downstream side plane. It then noted that both side planes were clearly explained in the specification as "side walls," or structural limitations of the claim. Citing to this court's decision in *Hoganas v. Dresser Indus., Inc.*, 9 F.3d 948, 28 USPQ2d 1936 (Fed. Cir.1993), the district court concluded that there was no reason to treat the bottom plane component any differently. The court additionally noted that the claim included the language "perforations in the bottom plane," and reasoned that "it would be difficult to imagine how one would put perforations 'in' a purely definitional geometric plane." Finally, the court noted that Figures 2a, 2b and 3 of the '520 patent all supported its understanding of the disputed language.

After construing the disputed claim language, the district court concluded that no reasonable jury could find that the Bar Screen plates literally infringed the patent. Significantly, the court noted that the accused plates have no physical "bottom plane."

The court next considered whether the Bar Screen plates infringe under the doctrine of equivalents. The court focused its inquiry on whether CAE is precluded from asserting infringement by equivalents under the doctrine of prosecution history estoppel. CAE argued that it was not subject to estoppel, because the "bottom plane" limitation was added to overcome a rejection based on indefiniteness, not prior art. This argument was rejected by the court, however, which held that reasonable competitors could review the prosecution history and conclude that CAE had given up coverage of the screen plates without physical bottom planes. The court granted Fiedler summary judgment on the issue of infringement by equivalents.

The court then considered Fiedler's motion for partial summary judgment on the issue of validity. Fiedler specifically argued that the '520 patent is anticipated under 35 U.S.C. §§ 102(b) and (e) by the Canadian '322 patent and the Frykhult patent. The court rejected this aspect of Fiedler's motion, based on the patent examiner's prior consideration of the references and the testimony of CAE's expert Mr. Frejborg. The court finally requested that the parties briefly outline any remaining issues for trial.

After the district court issued its order, the parties each submitted its outline of outstanding issues. In its outline, CAE asserted that

> [i]n view of this apparent holding that a flat bottom surface with the perforation completely within it is required in order for there to be infringement of any type, the Court's Order appears to relate *not only* to the Bar Screen that Fiedler specifically raised in the motion for summary judgment but *also to* the Top Screen. In view of the present disposition of the case, no factual infringement issue for a jury to determine remains.

(emphasis in original). CAE then invited the district court to "make its judgment of non-infringement final and certified under Rule 54(b)."

The parties then submitted a joint motion for entry of final judgment. In the motion, CAE declared that

[t]he submission of this motion by plaintiff CAE is not an admission that there is no infringement, but rather a statement that it appears that if the Court interprets the claims and prosecution history as it has in the Order of December 17, 1998, then the Court's decision on the Top Screen would be the same (non-infringement) as on the Bar Screen.

Meanwhile, Fiedler declared in the same motion that "Defendants' submission of this motion is not an admission that all of its TOP SCREEN screen plates are identical to those shown in Exhibits A and B." Subsequently, the district court granted the parties' joint motion, and ordered the clerk to enter judgment on behalf of Fiedler.

CAE then filed an appeal with this court, challenging the district court's conclusions on claim construction, literal infringement and infringement by equivalents. This court has jurisdiction, if at all, under 28 U.S.C. § 1295(a) (1994).

## II.

### JURISDICTION

■ Before turning to the merits of this case, the court must first address whether it may properly exercise jurisdiction over this appeal.

■ Congress codified the "final judgment rule" at 28 U.S.C. § 1291. Under the rule, parties may only appeal "final decisions of the district courts." *Id.* In *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), the Supreme Court defined a final judgment as "a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." By requiring parties "to raise all claims of error in a single appeal following final judgment on the merits," *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 374, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981), section 1291 "forbid[s] piecemeal disposition on appeal of what for practical purposes is a single controversy." *Cobbledick v. United States,*

309 U.S. 323, 325, 60 S.Ct. 540, 84 L.Ed. 783 (1940).

■ An order granting partial summary judgment is not a final appealable order under section 1291, because it does not dispose of all claims raised. *See Dannenberg v. Software Toolworks, Inc.,* 16 F.3d 1073, 1074 (9th Cir.1994). Thus, if a party wishes to appeal a partial summary judgment, it must ordinarily obtain a certification from the district court under Fed. R.Civ.P. 54(b). At the same time, courts have generally understood the practical realities of litigation under these circumstances, and have permitted an appeal without a Rule 54(b) order when events subsequent to the partial judgment satisfy the purposes of the final judgment rule. *See, e.g., Aluminum Co. of America v. Beazer East, Inc.,* 124 F.3d 551, 557 (3d Cir.1997) (holding that "[e]ven if the appeals court would have lacked jurisdiction at the time an appeal was filed, the court has jurisdiction if, as a result of subsequent events, there are no longer any claims left to be resolved by the district court").

■ In this case, CAE proposed a Rule 54(b) order to the court in its outline of the outstanding issues following the entry of partial summary judgment. But it did not formally move for such an order. Instead, it moved jointly with Fiedler for an entry of final judgment, seeking to expand the court's ruling on patent validity and non-infringement by the Bar Screen plates to include a judgment of non-infringement by the Top Screen plates. The district court granted the motion, and entered a final judgment holding that the patent was not invalid, and that neither the Bar Screen plates nor the Top Screen plates infringed the patent. This court, however, may exercise jurisdiction only if the district court's entry was final relative to all the pending issues. As in *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc.,* 203 F.3d 790, 792, 53 USPQ2d 1762, 1764 (Fed.Cir.2000), when "the finality of the dismissal in this case is a procedural

issue not related to patent law, this court applies the law of the regional circuit." Because this is a procedural issue within the jurisdiction of the regional circuit, the Eleventh Circuit, we defer to the law of that court.

A review of the joint motion shows that the entry was not final. When Fiedler moved for summary judgment, it sought only partial summary judgment on the issues of patent validity, the availability of the doctrine of equivalents, and non-infringement by the Bar Screen plates. It did not seek a ruling on the Top Screen plates. The district court ruled on Fiedler's motion, leaving the issue of infringement by the Top Screen plates remaining for trial. Seeking an immediate appeal primarily on the issue of claim construction, CAE recognized that outstanding claims remained on the Top Screen plates. But instead of formally moving for a Rule 54(b) certification, and satisfying all of the requirements under the rule, it jointly moved for final entry of judgment by appearing to concede non-infringement by the Top Screen plates under the district court's interpretation of the claims. A close look at that concession, however, shows that the issue of infringement by the Top Screen plates remained very much at issue.

In the joint motion for entry of final judgment, CAE states as follows:

> The submission of this motion by plaintiff CAE is not an admission that there is no infringement, but rather a statement that it appears that if the Court interprets the claims and prosecution history as it has in the Order of December 17, 1998, then the Court's decision on the Top Screen would be the same (non-infringement) as on the Bar Screen.

Fiedler hedges in no small part on the issue of infringement by the Top Screen plates as well, declaring that "Defendants' submissions of this motion is not an admission that all of its TOP SCREEN screen plates are identical to those shown in Exhibits A and B." These statements suggest that the motion is nothing more than an effort to manufacture appellate jurisdiction. By its motion alone, CAE has conceded nothing at all about the Top Screen plates, and in fact has explicitly reserved its right to challenge infringement in the future should this court affirm the district court's construction. If this court were to affirm, CAE could return to the district court and argue that it never conceded the issue of infringement, relying upon the clear language of the joint motion. Fiedler seems to agree that this is not only possible, but likely, as it contends in its appellate brief that the district court never entered final judgment on the Top Screen claims.

The court cannot permit an end-around of the specific requirements of Rule 54(b). CAE could have avoided any confusion by explicitly declaring that "given the district court's construction of the claims, we concede non-infringement by the Top Screen screen plates." Had it made this concession, no outstanding issues would remain before the district court, and the judgment would have been final. If this court would affirm the district court's construction, the case would end. If this court reversed, it could remand the case for further findings. Armed with the non-committal language of the joint motion, however, CAE could pursue relief from the district court no matter how this court rules. This is precisely the situation that the final judgment rule seeks to avoid.

The court is loath to sanction this type of appellate practice. The demands placed on the dockets of both this court and those of the federal district courts are severe enough without the added burden created by uncertain concessions made by parties eager for appellate review. Nevertheless, as discussed earlier, we must defer to the law of the Eleventh Circuit, which has held that "there is some flexibility in this [finality] rule in order that justice, and the economic termination of litigation may not suffer from an overly strict adherence to formalism. It must be remembered that

practical, not technical, considerations are to govern the application of principles of finality." *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 194 (11th Cir.1980). At oral argument, counsel for CAE conceded under questioning that the district court's claim construction resolved the issue of non-infringement for the Top Screen plates as well as the Bar Screen plates. This concession, although more appropriate had it been made before the district court, appears to satisfy the general purpose of the finality requirement. Accordingly, the court may exercise jurisdiction over the merits of this appeal. *Cf. Fox v. City of West Palm Beach*, 383 F.2d 189, 193 (5th Cir.1967) ("[W]hether a ruling is final … is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments.... Because of this difficulty this Court has held that the requirement of finality is to be given a practical rather than a technical construction."); *Bethel v. McAllister Bros., Inc.*, 81 F.3d 376, 382 (3d. Cir.1996) ("[A]n otherwise nonappealable order may become final for the purposes of appeal where a [party] voluntarily and finally abandons the other claims in the litigation.").

## III.

## LITERAL INFRINGEMENT

■ We turn first to the district court's grant of summary judgment of literal non-infringement. Upon a motion for summary judgment, a district court must decide "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On appeal, we apply this standard anew, without any deference to the determination of the district court. *See Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408,

1416, 54 USPQ2d 1141, 1146 (Fed.Cir. 2000).

■ When reviewing whether an accused device literally infringes a patent claim, we perform a two-step analysis. "First, the claims must be correctly construed to determine the scope of the claims. Second, the claims must be compared to the accused device." *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476, 45 USPQ2d 1608, 1610 (Fed.Cir. 1998). Thus, as *Kahn* instructs, we shall begin with the issue of claim construction. Claim construction is an issue of law, which we review without deference to the trial court. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454–56, 46 USPQ2d 1169, 1172–75 (Fed.Cir.1998) (*en banc*); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–81, 34 USPQ2d 1321, 1329–31 (Fed.Cir.1995) (*en banc*), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

■ At trial, the parties disagreed as to the meaning of one particular limitation within the asserted claims: "bottom plane." Specifically, the parties disputed whether the "bottom plane" of the groove in the claimed screen plate includes a bottom physical surface. According to CAE, the district court erred when it concluded that the limitation does require a physical surface. CAE argues that the trial court improperly read limitations from the patent's preferred embodiment into the claims and misconstrued the patent's prosecution history. Had the court focused on the language of the specification and the patent drawings, CAE continues, it would have avoided this error, and held that the disputed term imparts no physical surface requirement.

■ Claim construction starts with the language of the claim itself. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir. 1996); *see also Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344, 47 USPQ2d 1418, 1424 (Fed.Cir.1998) ("The

actual words of the claim are the controlling focus.") (citing *Thermalloy, Inc. v. Aavid Eng'g, Inc.*, 121 F.3d 691, 693, 43 USPQ2d 1846, 1848 (Fed.Cir.1997)). Claim 1 provides for grooves in the surface of the screen plate that include a "bottom plane." The claim further provides for an "upstream side plane" and "downstream side plane" for the grooves, at different orientations to the envelope surface. These side planes, along with the bottom plane, "form" the contours of the grooves. The bottom plane of the grooves further include "perforations."

▆▆▆ This language supports the interpretation adopted by the district court. The language specifies the orientation of the two side planes, the upstream side plane being "substantially perpendicular to the envelope surface of the screen plate" and the downstream side plane as forming "a 60–5 angle against the envelope surface." This description confirms that the terms refer to the structural walls of the grooves. Given this character of the side planes, there is little reason to believe that the third component "forming" the grooves, the bottom plane, does not also refer to a groove structure, particularly when all three groove components include the term "plane." *See Phonometrics, Inc. v. Northern Telecom, Inc.*, 133 F.3d 1459, 1465, 45 USPQ2d 1421, 1426 (Fed.Cir. 1998) ("A word or phrase used consistently throughout a patent claim should be interpreted consistently."). In some cases, a claim term can be given a different meaning in the various claims of the same patent, when a patent so provides. *See Georgia–Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1331, 52 USPQ2d 1590, 1598 (Fed.Cir.1999) (citations omitted). But here, we agree with the district court that it makes little sense to provide "perforations" in the "bottom plane" unless the plane refers to at least some physical structure.

The written description and figures further support this structural interpretation of the groove components. The description notes that one can adjust the turbu-lence force on the screened pulp by "changing the geometrics of the sidewalls of the grooves." In each of Figures 2a, 2b and 3, the invention includes a physical structure at the bottom of the plate's grooves.

CAE asserts that other text in the written description suggests that the bottom plane does not include any physical surface. Specifically, CAE notes the description of "the bottom plane of the groove" as "at least as wide as the diameter or width of the perforations." Any such suggestion, however, is belied by the patent's prosecution history. The patent examiner rejected claim 1 as originally filed, which provided for "[a] screen plate, wherein the perforations of the screen plate are disposed at the bottom of grooves the direction of which substantially deviates from the flow direction of the pulp to be screened." According to the examiner, the claim was "clearly anticipated" by United States Patent No. 4,276,159. The examiner also cited the Canadian '322 patent.

▆▆▆ In response, on May 7, 1984, the applicant canceled all the original claims and introduced claim 13, the predecessor to the claim subsequently issued as claim 1. Unlike original claim 1, claim 13 referred specifically to the "bottom plane," rather than the broader "bottom" of the groove. The "bottom plane" language had been included in original claim 3, which depended from claim 1. In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings. *See Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023, 4 USPQ2d 1283, 1288 (Fed.Cir.1987). Here, this suggests that "bottom plane" refers to a surface lying within the more general "bottom" of the groove.

This interpretation is also consistent with other prosecution history in the file wrapper. On May 10, 1984, the applicant distinguished claim 13 from the Frykhult patent, which disclosed a plate with a bot-

tom consisting of the gap between two side planes. The applicant contended specifically that "[n]othing in this reference teaches the use of perforations at the bottom of the recesses as stated in claim 13." One can only reasonably understand this amendment as suggesting that the claimed invention, in contrast to the Frykhult reference, has perforations in a physical structure constituting the bottom plane of the grooves.

 Given this overwhelming clarity of the intrinsic evidence, we conclude that the district court's interpretation of the limitation "bottom plane" is correct, and adopt it as our own. We further conclude that the district court properly ignored CAE's proffered extrinsic evidence on this issue, the testimony of Mr. Frejborg. In our decision in *Vitronics*, we held that when the intrinsic evidence is unambiguous, it is improper for a court to rely on extrinsic evidence such as expert testimony when construing disputed claim limitations. *See Vitronics*, 90 F.3d at 1583, 39 USPQ2d at 1577. As we explained,

> [i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence. In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless.

*Id.* (citations omitted); *see also Georgia-Pacific*, 195 F.3d at 1332, 52 USPQ2d at 1599. In *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309, 51 USPQ2d 1161, 1169 (Fed.Cir.1999), we stated that "had the district court relied upon the extrinsic evidence to contradict the claim construction unambiguously apparent from the intrinsic evidence it would have been error." Here, of course, there was no such reliance, and the district court did not commit any error. Because there is no genuine "ambiguity" in the intrinsic record relevant to this case, we conclude that the district court did not rely on the extrinsic evidence and properly ignored the proffered Frejborg testimony.

Applying the proper understanding of the meaning of "bottom plane" to the accused plates, it is clear that the district court was correct in granting summary judgment of no literal infringement. The accused plates do not include any physical structure as part of their grooves' "bottom plane." Accordingly, no reasonable jury could find that the plates literally infringe the asserted claim.

### IV.

### DOCTRINE OF EQUIVALENTS

 We now turn to the district court's summary judgment that the accused plates do not infringe the asserted claim under the doctrine of equivalents. The district court specifically held that CAE is estopped form relying on infringement by equivalents in light of the '520 patent's prosecution history. According to the district court, the applicant both amended the claims and argued against the prior art so as to disclaim coverage of any screen plate which does not include a physical structure in its "bottom plane." Because the accused plates lack such structure in the bottom plane of their grooves, the court held that infringement by equivalents was not possible.

 A device which does not infringe a patent claim literally may still infringe the claim under the doctrine of equivalents if each and every limitation of

the claim is literally or equivalently present. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35, 4 USPQ2d 1737, 1739–40 (Fed.Cir.1987). A claim limitation is "equivalently present" in an accused device if there are only "insubstantial differences" between the limitation and corresponding aspects of the device. *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1517–18, 35 USPQ2d 1641, 1645 (Fed.Cir.1995), *rev'd on other grounds*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Even though infringement by equivalents is an issue of fact ordinarily preserved for the jury, "[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." *Warner–Jenkinson*, 520 U.S. at 39 n. 8, 117 S.Ct. 1040.

 The application of infringement by equivalents, however, is limited by the doctrine of prosecution history estoppel. This doctrine provides that a patent owner can be estopped from relying upon the doctrine of equivalents when the patent applicant relinquishes coverage of subject matter during the prosecution of the patent, either by amendment or argument. *See Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376–77, 50 USPQ2d 1033, 1036 (Fed.Cir.1999). It is the totality of the prosecution history which defines and establishes the metes and bounds of the patent grant. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979, 52 USPQ2d 1109, 1113 (Fed.Cir. 1999). The purpose of prosecution history estoppel is to protect the notice function of claims, "measured from the vantage point of what a competitor was reasonably entitled to conclude." *Hoganas*, 9 F.3d at 952, 28 USPQ2d at 1939; *see also Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1036, 22 USPQ2d 1526, 1529–30 (Fed.Cir.1992). Whether or not prosecution history estoppel precludes a particular action for infringement by equivalents is a question of law, which we review *de novo* on appeal. *See Hoganas*, 9 F.3d at 952, 28 USPQ2d at 1939.

The history of the prosecution of the '520 patent in this case reveals that the applicant relinquished the very scope of equivalents now asserted by CAE. We focus specifically on arguments made by the applicant to distinguish the claimed invention from the Frykhult patent, which we noted earlier. The applicant argued that the invention of the '520 patent had uniquely positioned perforations in a physical structure constituting the bottom plane of the grooves. In particular, after the examiner referenced the Frykhult patent, the applicant argued that "the strainer of this reference is different from the screen defined in the claim of this application." The applicant observed that the Frykhult patent plate eliminated the wings, or foils, traditionally used to prevent clogging. By eliminating these wings, the Frykhult plate avoided the pressure impulses that created variations in the thickness of finished paper product. To accomplish these goals, Frykhult designed his plate so that the plate's grooves included no physical structure as part of the bottom. Instead, the bottom consisted of nothing more than the gap between the two side planes.

By distinguishing the claimed invention from the Frykhult plate, the applicant bound himself. One can only reasonably understand the applicant's declaration as abandoning any claim to the bottom described in the Frykhult patent, *i.e.*, a bottom without any physical structure constituting a bottom plane. The accused plates include precisely this type of bottom as part of their grooves. Accordingly, we conclude that CAE is estopped from relying on the doctrine of equivalents to cover the grooves of the accused plates, and that the grant of summary judgment of noninfringement by equivalents was appropriate.

## V.

## CONCLUSION

The judgment of the district court is *AFFIRMED.*

COSTS.

No Costs.